# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| ROBERT W. BREIGHNER, | ) | Civil Action No. 5:13-cv-00016 |
| | ) | |
| *Plaintiff,* | ) | REPORT AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN, | ) | By:  Hon. James G. Welsh |
| Acting Commissioner of Social Security, | ) | U. S. Magistrate Judge |
| | ) | |
| *Defendant* | ) | |
| | ) | |

The plaintiff, Robert W. Breighner, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ("the agency") denying his claims for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, as amended, 42 U.S.C. §§ 1381–1383f, and for disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 461(i) and 423.  This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

## I. Administrative and Procedural History

The plaintiff filed claims for DIB and SSI on March 22, 2010,[1] alleging a period of disability beginning on September 17, 2009 (R. 211).  Initially denied, the claims were reconsidered on February 14, 2011, and again denied. (R. 100, 128). Following an administrative hearing on September 20, 2011 the presiding ALJ confirmed this denial in writing (R. 21-41).  The Appeals

---

[1]  The application is dated March 22, 2010, however both the applicant (Brief of Plaintiff at 2, Docket No. 14 at 2, and the ALJ (R. 21) have used the appointment confirmation date (March 9, 2010) as the application date (R. 209).

Council denial of plaintiff's subsequent review request made the ALJ's unfavorable written decision the Commissioner's final decision (R. 1). *See* 20 C.F.R. § 404.981.

Along with his Answer (docket #9) to the plaintiff's Complaint (docket #3), the Commission filed a certified copy of the Administrative Record ("R.") (docket #10), which includes the evidentiary basis for the Commissioner's findings. Both parties have filed motions for summary judgment and supporting memoranda (docket #13, 14, 20, 21). Oral argument on these motions occurred by telephone on November 21, 2013. By standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. Issues Presented on Appeal

The ALJ first found that plaintiff met the Act's insured status requirements through March 31, 2014, and had not engaged in substantial gainful activity[2] since September 17, 2009, the alleged onset date (R. 23). He categorized several of the plaintiff's medical conditions as *severe*,[3] including: diabetes mellitus,[4] peripheral neuropathy,[5] major joint dysfunction (diffuse

---

[2]    Substantial gainful activity ("SGA") is work for pay or profit that brings in over a certain dollar amount per month. 20 C.F.R. § 404.1572. For example, in 2010 that amount was $1,000, and in 2000 it was $700; income over this monthly amount (net of impairment-related work expenses) is ordinarily considered to be engaging in SGA, and the amount generally changes annually along with changes in the national average wage indexing series. *See* 20 C.F.R. § 404.1574.

[3]    Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. § 404.1520(c).

[4]    Diabetes mellitus is "an autoimmune disease that results in the destruction beta cells of the pancreas, leading to the loss of the ability to secrete insulin." DORLAND'S ILLUSTRATIVE MEDICAL DICTIONARY 506 (32d ed.) 2012).

[5]    Neuropathy is a "functional disturbance or pathological change in the peripheral nervous system." *Id*. at 1268, The condition may be linked to diabetes. *Id.*

arthritis),[6] hypertension,[7] an organic mental disorder,[8] headaches, an affective disorder,[9] a cognitive disorder— not otherwise specified, and obesity (R. 23-24). He then determined that none of these impairments, either singularly or in combination, met or equaled a listed impairment, [10]and he also noted that the plaintiff had the non-severe impairments of high cholesterol and tobacco abuse (R. 24). Completing the sequential analysis mandated by the Agency,[11] the ALJ assessed the functional limitations caused by Mr. Breighner's impairments (R. 39) and concluded the plaintiff retained the capacity to perform "medium work,"[12] but was limited to frequent stair and ramp climbing, to occasional ladder, rope and scaffold climbing, and to frequent handling and fingering of objects (R. 26-27). In addition, the ALJ found the plaintiff to be additionally limited to "simply routine, repetitive work with no more than occasional decision making, no more than occasional and minimal changes in the work setting, and . . . only occasional use of judgment" (R. 27). Suggested work included the plaintiff's past work as an egg gatherer (R. 40).

---

[6] Arthritis is the inflammation of joints. *See id.* at 150.

[7] Hypertension is "high arterial blood pressure. . . [and] hypertension may have no known cause." *Id.* at 896.

[8] Term used "to denote any mental disorder with a specifically known or presumed organic etiology."*Id.* at 551.

[9] A mood disorder, which is a "mental disorder[] whose essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination." *Id.* at547, 551.

[10] The Listing of impairments is appendix 1 of subpart P of 20 C.F.R. pt. 404. The appendix details impairments the agency considers severe enough to prevent gainful activity, regardless of an individual's age, education, or work experience. 20 C.F.R. § 404.1525.

[11] By regulation the statutory definition of "disability" is reduced to five sequential questions. An examiner must consider: whether the claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment which equals an illness contained in the Social Security Administration's Listings of impairments found at 20 C.F.R. Part 4, Subpt. P, Appx. 1; (4) has an impairment which prevents the claimant from performing past relevant work; and (5) has an impairment which prevents the claimant from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

[12] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."20 C.F.R. § 404.1567(c).

The plaintiff challenges the ALJ's decision generally as unsupported by substantial evidence, (docket #14, p 1), and he specifically challenges the finding that his mild intellectual impairments are not of listing level (disabling) severity (docket #14, pp4-5).

### III. Summary Recommendation

Based on a thorough review of the administrative record, and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED**, that final judgment be entered **AFFIRMING** the Commissioner's decision denying benefits, and that this matter be **DISMISSED** from the court's active docket.

### IV. Standard of Review

The court's review in this case is limited to determining whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to DIB or SSI. "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id*. (quoting *Craig v. Chater*, 76 F.3d at 589).This standard of review is more deferential than *de novo*. The Commissioner's conclusions of law are, however, not subject to

the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## V. Facts

### A. Age, Educational, and Vocational Profile

In 2009, when Mr. Breighner alleges his disability began, he was 45[13] (docket #14, p 3; R. 211)). In school, Mr. Breighner reports, he struggled with math and was confined to separate special education classes. (R. 60-61). No documentation in the record supports this claim, and it is undisputed that he completed high school and entered the work force. (R.60, 224, 241). His work history includes employment as an automobile mechanic, a draw-bench operator, an egg gatherer, and a hotel manager (R. 263). According to the vocational witness, these jobs ranged from unskilled to skilled and exertionally from sedentary to heavy (R. 83). Following a work-related injury in December 2008, the plaintiff was treated for a soft tissue laceration of his right palm and a fracture of the right index finger. (R. 391-95). For most of the ensuing year, the plaintiff received workers' compensation benefits; he returned to work at some point, but was terminated in November 2009; he thereafter received unemployment benefits through the first quarter of 2010; despite looking for work, however, he was unable to find a job (R. 59-60, 66-67, 220, 234).

### B. Medical Record

Although the medical record contains no confirmation of an actual medical diagnosis, the record does indicate that Mr. Breighner was diagnosed to have of Type II (adult onset) diabetes

---

[13] At this age the plaintiff was classified as a "younger individual," but he became an "individual who is closely approaching advanced age" as of his fiftieth birthday. *See* 20 C.F.R. §404.1563.

mellitus at some point before 2009.[14] A February 11, 2009 medical treatment entry notes that Mr. Breighner had come to the doctor because his blood sugar was "out of whack," prompting the doctor to remark that this was unusual—Mr. Breighner's sugar was normally controlled and he, "ha[d]n't had labs in over a year" (R. 320).

Mr. Breighner's first post-onset-date doctor's visit occurred two months after his alleged disability date on November 5, 2009. (R. 353-56). The attending physician noted "suboptimal" control of the diabetes (R. 354), but he also noted that Mr. Breighner had come to the emergency room largely to get a prescription filled for free (R. 354). His glucose at that time was 213 mg/dL. (R. 356).

In the following months Mr. Breighner came to the Rockingham Memorial Hospital Emergency Room ("RMH-ER") and the Rockingham Free Clinic ("Free Clinic") only for treatment of a couple of non-diabetes-related medical care. In November 2009 he was seen for a nerve injury to his finger (R. 331); in February and March 2010 he was seen for dental care (R. 410, 412), and on July 12, 2010 he was seen for an ear infection and fevers (R. 452).

Although a dental history sheet notes that Mr. Breighner reported having experienced a diabetic coma in 2002 (R. 412) and that his glucose levels were at times high (R. 408, 410), there is nothing in the record to suggest that the status of the plaintiff's diabetes was a significant cause for medical concern. For example, he had "no numbness in [his] feet" on February 15, 2010 (R. 410) and "to have no diabetic retinopathy" when seen by his ophthalmologist on March 19, 2010 (R. 409, 470). Later the same month, for prophylactic reasons he was counseled by his physicians both on the proper use of medications (apparently because he was "skipping" one

---

[14] At the hearing, the ALJ provided Mr. Breighner fourteen days to supplement the record with the Bridgewater Family Practice records after plaintiff proffered "they were the doctors that really diagnosed the diabetes initially and I think . . . they would be relevant and helpful." (R. 57).It appears that these records were never submitted.

Lantus (insulin) dose every 1-2 days (R. 408)) and on the proper way to record his blood sugar (R. 407, 410). It was also recommended that he lose weight (R. 407, 453-55), and on occasion his insulin dosage was adjusted for symptom (afternoon nausea and discomfort) control (*see e.g.* R. 457). In August 2010 he told a Free Clinic physician that his blood sugar was good, ranging from 110-79 (R. 451) and that it was "gradually coming down" (R. 450).

Although "numbness [in his] feet/hands]" is noted on the diabetes residual functional capacity questionnaire completed by Dr. John Stauffer that same month, Mr. Breighner did not discuss this issue with any other primary care physicians (R. 434-38). Likewise, Dr. Stauffer's January 2011 responses to a range of motion questionnaire mentions Mr. Breighner's "history or poorly controlled diabetes" and also notes the plaintiff's history of "tak[ing] [his] medicines sporadically" (R. 473-74). Once again, there was no discussion in the record of any diabetic or other peripheral neuropathy.

As the following chart demonstrates, the bulk of Mr. Breighner's RMH-ER and Free Clinic visits during the decisionally relevant period involved routine lab work coupled with self-reported information provided on several occasions.

| Institution | Date | Glucose Level | Unit | Record |
|---|---|---|---|---|
| Rockingham Memorial Hospital | 9/19/2008 | 213 (7:12 am); 135 (10:42 am); 199 (15:30) | mg/dL | 402 |
| Rockingham Memorial Hospital | 1/12/2009 | 200 (9 am) 178 (11:14 am) | mg/dL | 382-86 |
| LabCorp Report | 3/6/2009 | 207 | mg/dL | 322-23 |
| Rockingham Memorial Hospital | 8/3/2009 | One specimen 175, one 261 | mg/dL | 321 |
| Rockingham Memorial Hospital | 8/3/2009 | 261 (morning); 175 (three hours later) | mg/dL | 362 |
| Rockingham Memorial Hospital | 11/5/2009 | 213 | mg/dL | 353-56 |

| Rockingham Memorial Hospital | 2/16/2010 | HBAIC (glycohemoglobin): 12.4 (between 300-330 mg/dL) | | 329 |
|---|---|---|---|---|
| Rockingham Memorial Hospital | 2/16/2010 | 289 | mg/dL | 415-19 |
| Rockingham Free Clinic | 3/8/2010 | Patient reported before dinner range of 200-71 | mg/dL | 408 |
| Rockingham Free Clinic | 3/23/2010 | 89 (after overnight fast) | mg/dL | 408 |
| Rockingham Free Clinic | 4/7/2010 | Patient reports 114-160s (mornings); 130-170s (afternoons) | mg/dL | 456-57 |
| Rockingham Free Clinic | 4/14/2010 | Patient reports 120s-160s (mornings); 80s-190s (afternoons) | mg/dL | 456 |
| Rockingham Memorial Hospital | 5/6/2010 | summary discharge report estimates average glucose level between 180 and 210 (HBAIC test: 8.60) | mg/dL | 327 |
| Rockingham Free Clinic | 5/12/2010 | Patient reports 120s-150s on average; 232 at appointment | mg/dL | 455-56 |
| Rockingham Memorial Hospital | 5/26/2010 | HGB AIC 8.60 (180-210 mg/DL) | | 467-68 |
| Rockingham Memorial Hospital | 8/3/2010 | HGB AIC 7.40 (150-180 mg/DL) | | 465-66 |
| Rockingham Free Clinic | 8/10/2010 | Patient reports 110-79 on average | mg/dL | 451 |
| Rockingham Free Clinic | 8/25/2010 | Patient reports 110-88 on average | mg/dL | 450 |
| Rockingham Memorial Hospital | 11/2/2010 | HBAIC 8.70 (180-210 mg/DL) | | 460 |
| Rockingham Memorial Hospital | 2/10/2011 | 457 (324 after insulin administered in ER) | mg/dL | 490 |
| Rockingham Memorial Hospital | 3/10/2011 | 201 | mg/dL | 495 |
| Rockingham Memorial Hospital | 5/23/2011 | 183 | mg/dL | 501 |
| Rockingham Memorial Hospital | 8/21/2011 | 239 | mg/dL | 512 |

In short, Mr. Breighner's diabetes treatment was at most routine and conservative. He was neither seen nor treated by an endocrinologist or other specialist. It is also noteworthy that his

only interaction with a specialist during this period was an unrelated consultive psychological evaluation in July 2010 (R. 423-29).

On that occasion David S. Leen, PhD., found Mr. Breighner to be a "reliable [and] credible historian" (R. 425) who "ha[d] sought employment [since sustaining a finger injury] but ha[d] not been hired" (R. 425). He also noted that the plaintiff "had never been hospitalized for psychiatric treatment" (R. 426), but had received psychological counseling in the 1990s "secondary to a sexual assault charge" and had "a past history of excessive alcohol use . . . until 1984" (R. 426).

On mental status examination, Dr. Leen found the plaintiff to be "grossly oriented," to exhibit "concrete, relevant and logical" thought processes, to be "anxious," and to feel mildly unwell (R.426). Based on his clinical interview and psychological testing, Dr. Leen's diagnostic impression was that the plaintiff exhibited a generalized cognitive disorder and mild mental retardation without any significant suggestion of any emotional disturbance or thought disorder (R. 428). In his opinion the plaintiff retained the mental ability to perform consistently "most simple and repetitive work activities in a timely and appropriate manner, . . . maintain reliable attendance, , . . . accept instructions, . . . deal appropriately with coworkers and the public, . . . complete a normal workweek without interruptions, . . . and deal with the usual stresses of competitive work" (R. 428).

*C. State Agency Evaluations*

At various times during the state agency's processing of the plaintiff's applications, Drs. William Amos, Nicole Sampson, Yvonne Evans, and R. S. Kadian reviewed and evaluated the plaintiff's medical records, including those from the Free Clinic, RMH-ER, New Market Family

Practice Center and the results of Dr. Leen's consultive mental status evaluation.[15] Each concluded that the medical record did not support a determination that Mr. Breighner was disabled (R. 93-101, 102-110, 115-127, 129-141). *Inter alia*, these non-disability conclusions were based on the "absence of any diabetic-related neuropathy, retinopathy or other complication[]" (R. 95), the absence of any "significant adaptive function deficits" (R. 95-96), the absence of any "severe limitations" in the plaintiff's activities of daily living (R. 96), his "good ability to stand and walk throughout a normal work day (R.127), his retained functional ability to perform simple and repetitive work despite his cognitive deficits (R. 123-124), and a "function-by-function evaluation of [the plaintiff's] exertional and non-exertional capabilities (R. 126).

### D. Testimony

At the administrative hearing Mr. Breighner testified that he had been in special education in high school and had experienced particular trouble concentrating in math (R. 60-61). He acknowledged, however, that he could perform basic math and count change (R.60-61). He stated that he retained his driver's license, but had not driven for many years (R.62, 64). Responding to questions from his attorney, the plaintiff testified that he had experienced a "sugar coma" once when driving his motorcycle and had to be hospitalized for ten days with blood sugar levels "[at] 745" (R. 65) and that he thereafter decided not to drive (R. 62-63). He denied any past drug or alcohol use (R.66), although the medical record reflects a past drinking problem, as the ALJ noted in his decision (R. 39). As part of his description of his work history, the plaintiff stated that following a work-related injury he had briefly received workers compensation, but it had been terminated and he "believe[s]" he then filed for unemployment

---

[15]    These are substantially the same medical records currently before the court.

benefits (R. 67). He explained that that his diabetes had begun bothering him; his ankles "tingled;" his leg muscles were painful "like a toothache," and his ability to keep up at work declined (R. 70-71). As a consequence, he stated that he lost his job and collected unemployment for some period during 2009-2010 (R. 67-68); however, he also stated that he had applied for no jobs since his alleged disability onset date of onset date of September 17, 2009 (R. 68).

Mr. Breighner testified that he currently takes less insulin than he did in 2009 (R. 72; however, he continues to experience significant neuropathic pain in his legs, both shoulders and neck (R. 72). These conditions, he testified, "pull" on his shoulders and arms, cause "tingling or numbness," and make it difficult for him to walk very far (R. 72-76). He also has to lay-down and "stretch out" to alleviate the tingling and pain (R. 76); he "sometimes . . . fall[s] when "leg give[s]-out on [him] (R. 79), and a loss of feeling in his hands causes him to drop things (R. 74-75). As a result of these problems, his girlfriend has to do his cleaning, laundry, cooking, give him his insulin shots, and help him with bathing (R 77). Mr. Breighner also stated that he is unable to do any outside work and that his condition limited him to only sporadic church attendance (R. 78, 81) but no other outings (though the ALJ took note of the plaintiff's "pretty tan" arms (R. 81).

## VI. Analysis

The plaintiff objects to the ALJ's decision on the grounds that it is unsupported by substantial evidence. Although the gravamen of his argument below was the disabling nature of his diabetes, his focus on appeal is the extent of his mild mental retardation, which he argues is both *severe* and of listing-level severity (docket #14, p 2). Specifically, the plaintiff contends it was error for the ALJ to conclude that he did not have "marked" limitations in at least two

domains of functioning (*Id*.).  *See* 20 C.F.R. §§ 404.1526 and 416.926a(b).  Secondarily, the plaintiff argues that the ALJ erroneously concluded that he retained the functional ability to perform a range of work at a medium exertional level. (*Id*.).  The crux of both contentions is that the ALJ improperly disregarded the plaintiff's testimony concerning his functional limitations and the opinion, albeit a non-disability assessment, of Dr. Stauffer based largely on the plaintiff's self-reporting.

### a. Credibility Determinations and Opinion Weight

Relying, in essence, exclusively on his own testimony the plaintiff argues that the ALJ should have uncritically accepted as facts his receipt of special education instruction during his high school years (docket #14, p 9), his difficulty handling and fingering (*Id*. at 12), his "slowed [production at work after] he began experiencing diabetic neuropathy" (*Id*. at 3),  his frequent tendency to drop things (*Id*. at 3), his inability walk more than a few hundred feet (*Id*. at 2), and his having spent ten days in the hospital in 2009 "drifting in and out of a diabetic coma" following a diabetic attack that led to a motorcycle wreck (*Id*. at 4).  The ALJ heard all of this evidence; he discussed it at length in his opinion (R. 27-29); he found that Mr. Breighner's impairments could be expected to cause such symptoms, and he concluded "the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" (R. 29).  He described the plaintiff's credibility as "quite low," and in doing so took note of the internal inconsistencies in the plaintiff's testimony, and discrepancies between the plaintiff's prior statements and those on the record (R. 39).

This court is bound to accept the ALJ's credibility determinations absent "exceptional circumstances." *Eldeco v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) ("When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent

'exceptional circumstances.'"). Exceptional circumstances come into play only "where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (internal citations omitted).

Here there is no "exceptional circumstance" justifying remand. The plaintiff's credibility was evaluated using the required two-step process. *See Craig v. Chater*, 76 F.3d 858, 594 (4th Cir. 1996). The ALJ provided a logical basis for his conclusions, and "as long as substantial evidence in the record supported th[is] conclusion, this Court must give great deference to the ALJ's credibility determinations." *Caudle v. Colvin*, 2013 U.S. Dist. LEXIS 155962, *42 (EDVa. Oct. 15, 2013) (citing *Eldeco, Inc. v. NLRB,* 132 F.3d 1107, 1011 (4th Cir. 1997)).

In making his evaluation of a plaintiff's credibility, the ALJ has the responsibility to draw inferences from, and resolve conflicts in, the record. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985) (citing *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984). Thus, when a claimant challenges the ALJ's exercise of that authority, the claimant must show that the ALJ either ignored crucial portions of the record or that his credibility finding was patently unreasonable given the evidence in the record. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Mr. Breighner has made no such showing meritless, and this claim of administrative error is totally without merit.

Plaintiff similarly disputes the decisional weight awarded to Dr. John Stauffer's opinion, arguing that under *Mastro v. Apfel*, 270 F.3d 171 (4th Cir. 2001), "persuasive contradictory evidence" is required to disregard the evidence of a treating physician (R. 14). This formulation misstates the conclusion of *Mastro*, which held that a treating physician's opinion "is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."

13

*Mastro,* 270 F.3d at 178. Moreover, the court in *Mastro* went-on to note, when the opinion is unsupported by clinical evidence or is inconsistent with other substantial evidence the ALJ may assign such an opinion less weight. *Id.*

At some point in the past (at least before September 2007) it appears that the plaintiff may have been seen or treated by Dr. Stauffer on a regular basis, but the more than two hundred pages of medical records before the court contain only two entries referencing any more recent treatment by Dr. Stauffer (New Market Health Center).[16] On February 11, 2009 the plaintiff was seen for complaints of an ear ache and for blood sugars that had been "out of whack" (R.320). On that occasion, Dr. Stauffer noted that the plaintiff's blood sugar level was "normally . . . controlled" and he further noted that the plaintiff had not had any laboratory studies done "in over a year" (*Id.*). One week later the plaintiff returned for follow-up treatment of his ear infection (R. 319), and after the passage of nearly six months the plaintiff saw Dr. Stauffer for a third and final time (albeit not for treatment) in 2009, when he requested a letter "with regard to [his problems with] fluctuating blood sugars [and] stress" (*Id.*).

On September 27, 2010, after an absence of fourteen months, the plaintiff returned to Dr. Shauffer's office "because he is seeking disability and the free clinic will not apparently fill out forms for him in this regard" (R. 478). Based on a review of his vital signs, a perfunctory physical examination, no laboratory testing and primarily a reliance on the plaintiff's self-reporting of "some arthritis, left shoulder and arm pain of uncertain etiology," Dr. Stauffer completed a five-page residual functional capacity questionnaire in which he opined that the plaintiff had no functionally limiting emotional issues and was capable of low stress work requiring lifting and carrying as much as twenty pounds occasionally and requiring postural

---

[16] A February 15, 2010 Free Clinic new patient note records the plaintiff's self-report that he had been "previously seen by Dr. Stauffer [and was] last seen [September, 2007]" (R.410).

movements only rarely (R.434-38). In his questionnaire responses Dr. Stauffer also expressed his lack of certainty or lack of knowledge about any work-related walking issue, any need for unscheduled work breaks, any fine or gross manipulation limitation, any likelihood of significant impairment-related absences from work, and the onset date of these symptom and limitations (*Id*.).

One month later, Dr. Stauffer completed a second check-box form in which he opined that the plaintiff's diabetes was of listing level severity due to a related neuropathy significantly affecting motor function in two extremities (R.440-41). There is, however, nothing in the record to suggest that this conclusory opinion was based on any clinical examination, any laboratory or other test results, any evidence of extremity edema, any medical notation of a severe and debilitating neuropathy, or any other objective medical evidence to substantiate this opinion. *See Linkenhoker v. Astrue,* 2012 U.S. Dist. LEXIS 156191, *6 (WDVa. Oct. 31, 2012) ("[B]ased on the absence of any medical notation of severe and debilitating neuropathy, . . . the [ALJ] properly discounted the [physician's] medical opinion.").

Three months later, on January 4, 2011 the plaintiff asked Dr. Stauffer once again to complete additional forms to assist with his disability claims (*See*R.4 73, 474, 476). Responding to this request "to the best of [his] ability," Dr. Stauffer reporter that Mr. Breighner had moderately decreased range of motion in his neck, back, left shoulder and upper arm, and that his range of motion was otherwise "okay" (R. 476). He found the plaintiff's generally to demonstrate full strength throughout, to be able to walk on his heels and toes, and to demonstrate deep tendon reflexes only in the knee cap area (*Id*.).

On April 30, 2012 Dr. Stauffer essentially repeated the responses he had previously make in the functional capacity questionnaire dated September 30, 2010 (R. 434-38, 520-24).

Although it was submitted to the Appeals Council as additional evidence and as part of the plaintiff's request for review, it was not "new" evidence necessitating Appeals Council review. *See Wilkins v. Sec'y, Dep., of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (Evidence is new only "if it is not duplicative or cumulative. . . ."); *see also* 20 C.F.R. § 404.970(b); *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011).

There is no evidence that Dr. Stauffer ever prescribed medication, ordered testing, or in any meaningful or relevant way treated Mr. Breighner. His opinion is unsupported by any medical evidence of record, and it was within the ALJ's discretion to find Dr. Stauffer's opinion non-controlling.

### b. Substantial Evidence

Mr. Breighner further contends that the record evidence was improperly weighed, and in fact supports a finding that his mental impairment is both severe and of listing-levels, and that he is unable to work. (Plaintiff's Brief, at 2). This claim of error is also without merit.

### Severity

Although the plaintiff contends that his mental impairment is severe, he offers minimal evidentiary support of this contention. He testifies that he was in special classes in school (R. 60-61), but produced no records in support of this statement, and in his applications aver that he was not disabled prior to age twenty two (R. 218). He relies heavily on the consultive examination report of Dr. Leen, but as the Commissioner noted during oral argument and in her brief (docket #16, p. 8), this report is hardly a ringing endorsement of plaintiff's infirmity. Dr. Leen qualifies his IQ test results as provisional and notes that though "no highly suggestive evidence in the current test data that he had ever functioned intellectually at a significantly

higher level. The claimant's employment history as he currently reports it raises the possibility that he had functioned in the past at a significantly higher intellectual level" (R. 427). He describes plaintiff's self-reported "constriction in his activities and social functioning secondary to his diabetes symptoms" (R.427), but offers no opinion on the interplay of Mr. Breighner's diabetes and any mental difficulties. Though he deemed Mr. Breighner unable to handle funds, it is unclear how he determined this—Dr. Leen described Mr. Breighner's retardation as "mild." (R. 428), and clearly indicated Mr. Breighner was capable of working. Mr. Breighner could, in Dr. Leen's opinion, perform "simple and repetitive work activities," "accept instructions" and "deal appropriately with coworkers and the public." (R. 428). He found the plaintiff "able to deal with the usual stresses of competitive work" and "able to complete a normal workweek without interruptions resulting from his intellectual impairments." (R 428). Furthermore, when asked in an earlier undated questionnaire, Mr. Breighner represented that he could pay bills, count change, handle a savings account and use a checkbook (R. 257), and in a second questionnaire Mr. Breighner reiterated his ability to count change (R. 298).

After observing Mr. Breighner at the hearing, reviewing his work history and noting the lack of any medical or school records showing a history of mental problems, the ALJ concluded that any mental retardation was not severe within the meaning of the statute (that is: it did not cause "more than minimal limitation of the claimant's basic work-related capacities") (R. 24).Dr. Leen's report accords with the ALJ's determination, which was clearly supported by substantial evidence.

*Listing-Level Disability*

Plaintiff further argues that his mental limitations fulfill a listing, either because the plaintiff was severely disabled before twenty-two or because he has both a low IQ and marked limitations in two areas of functioning. *See* 20 C.F.R. Part 4, Subpt. P, Appx. 1, listing §§ 12.00 and 12.04. He begins with the conclusory contention that the "evidence demonstrates . . . onset of the impairment before age 22" (Plaintiff's Brief at 10); however, but this assertion is directly contradicted in the plaintiff's own application for disability benefits, in which specifically states he was not disabled before twenty-two. (R. 218).

Plaintiff then asserts alternatively that the record demonstrates marked limitations in at least two domains of functioning, but this contention is equally without merit. It is based solely on his own hearing testimony concerning the intensity, persistence and limiting effects of his symptoms, and that testimony was found not wholly credible (R. 28-29). As the ALJ outlined in his decision, the medical record provides ample support for this finding. *Inter alia*, the ALJ noted inconsistencies in the plaintiff's testimony, the lack of support in the medical record and several of his reports to his physicians, including "walking around on the farm looking for new [calves]" (R. 455) and walking to the post office (R. 484-85). The ALJ also took note of a state agency employee's contact with an aunt of the plaintiff who "had some trouble thinking of how the [plaintiff's] condition affects his family activities aside from being unable to work" (R. 484-85). During the state agency work-up of his claims, the plaintiff reported caring for pets (R. 255), making simple meals (R. 256), and performing household tasks like cleaning and laundry (R. 256). He noted visiting family and talking on the phone daily, as well as regular church attendance (R. 258). As indicated, the ALJ discussed this evidence, and noted that there are no episodes of decompensation in the record. Thus, even if Mr. Breighner experienced difficulties with "concentration, persistence, or pace," he would not fall within the two areas of marked

restriction required by the listing. *See* 20 C.F.R. Part 4, Subpt. P, Appx. 1, listings 12.00 and 12.04. Moreover, in reaching this conclusion the ALJ considered the entire record, and grounded his analysis with specific citations. In short, it cannot be said credibly that the ALJ's determination was so divorced from fact to be unsupported by substantial evidence.

*Residual Functional Capacity*

Mr. Breighner's final attempt at reversal is at best a bare assertion that the ALJ erred in finding him capable of work at a medium level of exertion. It is grounded once again on his own testimony, along with his self-reported statements to Dr. Stauffer, the "provisional" and equivocal report of the consultive psychologist (Dr. Leen), and the incomplete and ambiguous reports of Dr. Stauffer (docket #14, p. 11-12).

Manifestly based on substantial evidence, the ALJ concluded that Mr. Breighner's testimony concerning the intensity, persistence and disabling nature of his diabetic neuropathy and mental health symptoms was not credible to the extent it was inconsistent with his ability to perform a range of jobs at a medium level of exertion with certain postural, climbing, gross and fine coordination limitations and requiring simple repetitive effort and only occasional use of judgment (R. 26-27, 29). Taking into account the plaintiff's physical and mental complaints that were supported in the record and based on the evidence, including *inter alia* the finding of the consulting psychologist that the plaintiff was mentally able to perform simple repetitive work (R. 428) and the finding of the state agency physician[17] that the plaintiff was physically able to perform a range of work at a medium level of exertion (R. 121-123), the ALJ posed an appropriate hypothetical inquiry to the vocational witness (R.84, 86). *See Fisher v. Barnhart*,

---

[17] "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims under the Act." Social Security Ruling 96-6p.

181 F. Appx. 359, 364 (4th Cir. 2006) ("[A] hypothetical question is unimpeachable if it 'adequately reflect[s]' a residual functional capacity for which the ALJ had sufficient evidence.") (quoting *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005)).

It is not the role of this court to determine whether Mr. Breighner's testimony was fully credible or not. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Likewise, it is not the role of this court to weigh the evidence and determine the combined effect of the plaintiff's multiple impairments. *See* 20 CFR §§ 404.1523 and 416.923. Rather, the court has a narrow role in reviewing claims brought under the Social Security Act, and the question before it is whether the ALJ applied the proper legal standard in assessing Mr. Breighner's credibility and whether the ALJ's decision is supported by substantial evidence. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d at 589). It is the Commissioner's prerogative to weigh that evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), and on review it is evident that the ALJ properly evaluated the evidence of record, and his decision is supported by substantial evidence.

## VII. Proposed Findings

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. The plaintiff was 45 years of age at his alleged onset date;

2. The plaintiff has a high school education;

3. His past relevant work includes work as an auto mechanic, a draw-bench operator, an egg gatherer, and a hotel manager;

4. The plaintiff has not engaged in significant gainful activity since his alleged disability onset date of September 17, 2009;

5. The plaintiff has following *severe* impairments: diabetes mellitus, peripheral neuropathy, major joint dysfunction (diffuse arthritis), hypertension, an organic mental disorder, headaches, an affective disorder, a cognitive disorder—not otherwise specified, and obesity;

6. The plaintiff's mild intellectual impairments are not of listing level (disabling) severity;

7. The plaintiff's diabetes-mellitus and attendant neuropathy is not of listing level (disabling) severity;

8. The medical evidence concerning Mr. Breighner's alleged mental impairment was sufficient for the ALJ to decide the case;

9. Through the date of the Commissioner's final decision, none of the plaintiff's impairments, either singularly or in combination, was is medically equivalent in severity and duration to the criteria of any listed impairment;

10. Through the date of the ALJ's decision, the plaintiff did not have "marked" limitations in at least two functional domains;

11. It was within the ALJ's discretion to find Dr. Stauffer's opinion non-controlling, and this determination is supported by substantial evidence;

12. The ALJ's assessment of the plaintiff's credibility is supported by substantial evidence;

13. The ALJ's decision to give little decisional weight to the opinions of Dr. Stauffer is supported by substantial evidence;

14. The Commissioner's final decision is supported by substantial evidence;

15. The Commissioner's final decision is free of legal error; and

16. The final decision of the Commissioner should be affirmed.


## VIII. Transmittal of the Record

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

### IX. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: This 1st day of April 2014.

*s/ James G. Welsh*

United States Magistrate Judge